IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NIKKI GILMORE, | ) | CASE NO.  1:13-CV-2058 |
| *o/b/o* D.D.G., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 16).

The issue before the undersigned is whether the final decision of the Commissioner of Social

Security  (the "Commissioner") denying Nikki Gilmore's ("Plaintiff") application for

Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C.

§1381 *et seq*., on behalf of D.D.G., is supported by substantial evidence and therefore

conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.  INTRODUCTION & PROCEDURAL HISTORY

On October 28, 2009 Plaintiff applied for Supplemental Security Income benefits on

behalf of D.D.G. (Tr. 199-201).  Plaintiff alleged D.D.G. became disabled on May 1, 2009, due

to suffering from attention deficit hyperactivity disorder ("ADHD"), oppositional defiant

disorder, depression, and problems with self-control and becoming easily distracted. (Tr. 220).

Plaintiff later amended D.D.G.'s alleged onset date of disability to October 28, 2009. (Tr. 260).

D.D.G.'s application was denied initially and upon reconsideration. (Tr. 64-66, 70-72).

1

On April 9, 2012, Administrative Law Judge ("ALJ") Valencia Jarvis convened a hearing to evaluate the application. (Tr. 28-88). Plaintiff and D.D.G., along with counsel, appeared before the ALJ and testified. (*Id.*). On June 1, 2012, the ALJ issued an unfavorable decision denying Plaintiff's request for benefits. (Tr. 11-23).

Subsequently, Plaintiff sought review of the ALJ's decision from the Appeals Council. (Tr. 7). The Appeals Council denied Plaintiff's request, thereby making the ALJ's June 1, 2012, decision the final decision of the Commissioner. (Tr. 1-4). Plaintiff now seeks judicial review of the Commissioner's denial pursuant to 42 U.S.C. § 1383(c).

### III.    EVIDENCE

#### A.  Personal background information

D.D.G. was born on April 7, 1996, making him 16-years-old and in the tenth grade at the time of the ALJ's determination. (Tr. 34). Accordingly, when the ALJ rendered his decision, D.D.G. was an "adolescent" for social security purposes. *See* 20 C.F.R. 416.926a(g)(2)(v).

#### B.  Educational records

D.D.G.'s grades in fifth and sixth grade were predominantly "A's" and "B's." (Tr. 269). During the 2008 to 2009 school year, when D.D.G. was in the seventh grade, he received "C's" and "D's." (Tr. 269-70). While in eighth grade, the 2009 to 2010 school year, D.D.G.'s grades were mostly "C's," "D's," and "F's." (Tr. 270).

In January 2010, eighth grade teacher Carrie DeWitt reported that D.D.G. was performing at grade level in reading, math, and writing. (Tr. 343-44). D.D.G. was in regular classes. Ms. DeWitt also reported that the child was capable of completing assignments at grade level, though he did not always turn them in. (*Id.*).

During February 2011, Mr. T. Lockmiller, D.D.G.'s ninth grade English teacher, completed a teacher questionnaire. (Tr. 441-48).  Mr. Lockmiller saw D.D.G. for class every school day. (Tr. 441).  In the domain of attending and completing tasks, the teacher identified "very serious" and "serious" problems in nine out of the thirteen activities associated with the domain. (Tr. 443).  Mr. Lockmiller indicated that these problems occurred on a daily basis.  Activities where D.D.G. struggled included focusing long enough to finish assigned tasks, refocusing when necessary, changing from one activity to another without being disruptive, and working at a reasonable pace. (*Id.*).  As to the domain of caring for yourself, Mr. Lockmiller found D.D.G. had very serious problems in five out of the ten activities listed. (Tr. 446).  These problems arose weekly in areas including, handling frustration appropriately, being patient when necessary, using good judgment regarding personal safety, and identifying and appropriately asserting emotional needs. (*Id.*).

Ms. B. Adams, D.D.G's ninth grade math teacher, also completed a teacher questionnaire in February 2011. (Tr. 449-56).  In regard to attending and completing tasks, Ms. Adams found that the child had very serious or serious problems in eight of the thirteen activities listed. (Tr. 451).  These problems arose on a daily basis. (*Id.*).  Ms. Adams explained that D.D.G. did not focus, pay attention, or turn in and complete assignments. D.D.G. became very irritated when addressed or approached and would disrupt the entire class when asked to participate. (*Id.*).  Ms. Adams identified five very serious problems with regard to activities that related to caring for yourself. (Tr. 454).  Ms. Adams wrote that D.D.G. did not handle frustration well or accept and respect authority. (*Id.*).

3

From 2010 to 2011, the ninth grade school year, D.D.G's grades were mostly "B's" with two "D's" and a "C." (*Id.*).  During the administrative hearing, D.D.G. testified that he was in the tenth grade and his grades were "A's" and "B's" with one "C." (Tr. 34).

**C.  Medical records**

**1.  Bellefaire Jewish Children's Bureau**

In April 2009, D.D.G.'s school referred him to Bellefaire Jewish Children's Bureau ("Bellefaire") for an individualized service plan ("ISP") to address his anger issues, arguing, tantrums, and disruptive behaviors at school. (Tr. 280-94).  D.D.G. was noted to have problems with suicidal ideation, a recent suicide attempt, depressive symptoms, and anger. (Tr. 280).  A mental status examination revealed decreased impulse control and frustration tolerance, reduced eye contact, a restricted affect, sadness, and anger. (Tr. 281).  In school D.D.G. talked too often and yelled at teachers; he was aggressive, oppositional, easily distracted, impulsive, and moody. (Tr. 285).  He was working below his ability level. (Tr. 286).  At the time of the intake evaluation, it was reported that D.D.G was taking Concerta and Guanfacine for ADHD and ODD behaviors. (Tr. 289).  D.D.G. was diagnosed with major depressive disorder, single episode, severe, with psychotic features. (Tr. 290).  D.D.G. underwent therapy for approximately two months until his mother removed him from treatment in July 2009. (Tr. 259-306).

In October 2009, Plaintiff brought D.D.G. back to Bellefaire for symptoms of depression and recurrent suicidal ideation. (Tr. 317).  D.D.G. continued to display irritability and disrespectful behavior toward teachers and his mom; he had difficulty focusing and completing tasks. (*Id.*).

4

### 2.  University Hospital

D.D.G. underwent treatment as University Hospital of Cleveland Division of Child and Adolescent Psychology from January through July 2010. (Tr. 351-80, 418-33).  On January 20, 2010, Plaintiff reported to Paul Trombley, M.D., that D.D.G. was doing much better in school academically on medication. (Tr. 378).  D.D.G. and his teachers also stated that he was feeling better and had improved attention when on medication. (*Id.*).  However, Plaintiff indicated that D.D.G. was falling asleep later in the day, causing her to stop giving D.D.G. his medication around D.D.G.'s winter break.  She did not re-start D.D.G. on medication when school began again. (*Id.*).  The doctor opined that drowsiness could be due to the medication wearing off. (*Id.*).  After medication compliance ceased, D.D.G. exhibited oppositional behavior at school and received two detentions. (*Id.*).  Plaintiff felt that D.D.G.'s behavior had worsened due to lack of medication, causing D.D.G. to exhibit behavioral problems at home as well, including arguments with herself and siblings. (*Id.*).  Dr. Trombley strongly recommended that D.D.G. restart medication and expressed concerned about their commitment to treatment. (Tr. 379).

On February 19, 2010, D.D.G. reported that things were not going well, in that he had fought with his sisters and mother, and was suspended twice for swearing at a teacher. (Tr. 366).  Dr. Trombley discontinued Concerta and started D.D.G. on Lexapro. (Tr. 367).  On March 5, 2010, D.D.G. reported that he was in a physical fight with another child at school, resulting in suspension. (Tr. 360).  However, he also stated that he felt calmer and less irritated on Lexapro. (Tr. 360, 362). Plaintiff agreed there had been mild improvement in the same regards. (*Id.*).  Dr. Trombley spent significant time discussing alternative treatment facilities with Plaintiff, given her apparent dissatisfaction, and the doctor also emphasized the need for D.D.G. to receive more intensive therapy, such as in-home counseling. (Tr. 361, 363).  Plaintiff communicated that she

5

had no intention of changing her behavior, feeling that D.D.G. had the problem. (*Id.*).  On April 7, 2010, the child reported being suspended for making an inappropriate joke about violence at school. (Tr. 353).  But interactions between D.D.G. and Plaintiff had become less aggressive. (Tr. 355). Plaintiff also reported that D.D.G. was more sedated on Lexapro, yet she had not given him the medication for the past week. (Tr. 356).

On April 30, 2010, D.D.G. told Dr. Trombley that things were "good" and he was experiencing no major problems at home or at school. (Tr. 431).  He was "no longer sad all the time," denied anger and irritability, had a good appetite, and his grades had improved. (*Id.*). D.D.G. was "mostly compliant" with Lexapro and felt it helped his mood. (*Id.*).  D.D.G. reported that he received a ticket for walking in the street, because he was disrespectful to the police officer who instructed him to walk on the sidewalk. (*Id.*).  Dr. Trombley opined that D.D.G. lacked insight as to his behavior. (*Id.*).  The doctor recommended the child continue Lexapro, be monitored for medication compliance, and encouraged home therapy. (Tr. 432).

During June 2010, D.D.G. reported he was doing well and had started in-home therapy the previous week. (Tr. 425).  Dr. Trombley related that D.D.G. continued to have problems with authority and exhibited oppositional behavior. (*Id.*).  However, the doctor noted that after an argument with his mom where D.D.G. became angry, he was able to control his temper and think about his actions. (*Id.*).  D.D.G. felt he could continue to practice this skill in the future. (*Id.*). During the examination, Dr. Trombley described D.D.G. as open and cooperative, with a good mood, but blunt affect. (*Id.*).

On July 25, 2010, Plaintiff reported that she had nothing "detrimental" to say about D.D.G. (Tr. 419).  However, Plaintiff stated that D.D.G. was not always compliant with taking medication, and he had not taken medication that day, because Plaintiff felt he had not needed it.

(*Id.*).  D.D.G.'s in-home therapist confirmed he was not compliant with medication. (Tr. 420). The doctor discontinued Lexapro and planned to address medication with Plaintiff at a future visit, as she had left this session to run errands. (*Id.*).

D.D.G. did not receive medical treatment from August 2010 to July 2011.  Plaintiff claimed this lapse in treatment was due to a change in insurance, which prevented her from obtaining access to services for D.D.G. (Tr. 525).

### 3. Consultative Examiner

On April 27, 2010, D.D.G. underwent a consultative examination with state agency psychologist Deborah Koricke, Ph.D. (Tr. 382-86).  He was in the eighth grade.  Upon mental status examination, Dr. Koricke found that D.D.G. was easily distracted, somewhat hyperactive, and impulsive in responding to questions, which often had to be repeated. (Tr. 384). He was not taking medications for ADHD at the time of the examination.  However, he gave good effort and displayed no receptive or expressive language disorders.  Dr. Koricke described D.D.G's affect as depressed and unhappy; his facial expressions and voice were monotone.  D.D.G. reported feelings of failure, guilt, and worthlessness.  Dr. Koricke estimated that the child was functioning in the average range of I.Q., but his learning may have been negatively impacted by his significant ADHD and ODD in the classroom. (*Id.*).  She felt that D.D.G.'s insight and judgment into his situation were limited due to his mental impairments. (Tr. 385).  In terms of daily activities, D.D.G. had chores that included cleaning his room, taking out the garbage, and rotating cleaning the bathroom and living room monthly.  He required constant reminders to complete chores. (*Id.*).

Dr. Koricke diagnosed ADHD, ODD, major depressive disorder, and assigned a Global Assessment of Functioning ("GAF") score of 50, representing serious symptoms or serious

impairment in functioning. (Tr. 385).  She concluded that D.D.G. exhibited significant outward signs of attention deficits and increased behavior levels, and was not currently being treated medically for ADHD.  He was taking Lexapro for depression. (*Id.*).

### 4. State Agency Physicians

On May 25, 2010, state agency physician Roseann Umana, Ph.D., completed a review of the record and concluded that D.D.G. did not functionally equal the listing. (Tr. 388-92).  More specifically, she identified a "less than marked" limitation in the domain of attending and completing tasks. (Tr. 389).  She explained that at the time of the consultative examiner's report, D.D.G. was not taking medications for his ADHD, and was easily distracted, somewhat hyperactive, impulsive in responding, required structure to get back on task, and his concentration skills were "2/3 age appropriate." (*Id.*).  Dr. Umana identified no limitation in the domain of caring for yourself. (Tr. 390).  She found a less than marked limitation in the domain of acquiring and using information, and a marked limitation in interacting and relating with others. (Tr. 389).

On August 12, 2010, state agency physician Marianne Collins, Ph.D., conducted a second review of the record. (Tr. 435-37).  She assigned the same level of limitation in each domain as state agency reviewer Dr. Umana. (*Id.*).

### 5. Berea Children's Home and Family Services & Metrohealth Hospital

On July 24, 2011, Plaintiff sought treatment for D.D.G. at Berea Children's Home and Family Services ("Berea") due to aggressive behavior and other mental health concerns. (Tr. 524).  During the intake evaluation, a health care provider described D.D.G. as cooperative, but appearing withdrawn, displaying little range of affect, and making little eye contact. (*Id.*). D.D.G. described problems with his mood, including feeling frequent anger, a desire to be

physically aggressive, and irritability. (*Id.*).  Plaintiff explained that D.D.G.'s behavior and mood had improved while he was taking medication and receiving counseling, but worsened in the last few months when treatment had ceased after a change in insurance prevented access to treatment. (Tr. 525).  She explained that D.D.G. had fits of rage, hit his younger siblings, and had become resistant to doing or completing chores. (*Id.*).  Plaintiff was concerned about the child's increase in anger and aggressive behavior, because in the past this pattern of behavior had led to D.D.G. feeling guilty, depressed, and eventually attempting suicide. (*Id.*).  D.D.G. was assigned a GAF score of 48, indicating serious symptoms. (Tr. 551).  D.D.G. began weekly at-home treatment with therapist Dierre Cody.

On October 6, 2011, healthcare provider James Christopher noted improvement in D.D.G.'s mood and focus, with reports from Plaintiff that D.D.G. was less irritable and more calm overall. (Tr. 487).  D.D.G. had started Concerta and Lexapro, though he had missed taking Lexapro for three days. (*Id.*).  By October 17, 2011, D.D.G. reported that his mood was more stable, and he felt less depressed.  (Tr. 484).  He acknowledged that he had the ability to consistently demonstrate appropriate behaviors. (*Id.*).

On November 10, 2011, Plaintiff reported to Mr. Cody that he had cut his arm with a kitchen knife after an argument with his girlfriend. (Tr. 479).  On November 25, 2011, Plaintiff brought D.D.G. to Metrohealth Hospital because she saw cuts on his forearm and was concerned that he was having suicidal thoughts. (Tr. 555).  D.D.G. reported that he had again become frustrated with his girlfriend and made cuts on his arm.  Two years prior to this incident, D.D.G. had tried to hang himself with a belt.  D.D.G. denied that his current actions were a suicide attempt and described them as a moment of rage.  D.D.G. had not been compliant with taking his

medication that week. (*Id.*).  The child was discharged home to follow through with his psychiatrist and re-start medication. (Tr. 556).

On December 7, 2011, D.D.G. acknowledged that when he became upset with others, he tended to shut down or attack them verbally or physically. (Tr. 466).  However, he said he would use his coping skills if he found himself in such a situation.  D.D.G. had made efforts to improve his interpersonal skills, but realized he had room for improvement. (*Id.*). Mr. Cody opined that D.D.G.'s overall functioning was good, and he had improved his grades to all "As, Bs, and [one] C." (*Id.*).  On December 20, 2011, D.D.G. treated with Mr. Cody and reported that his midterm grades reflected that he was performing well in all classes. (Tr. 463).  The therapist opined that D.D.G.'s overall functioning was stable and improving, with the child performing well academically and behaviorally at school. (Tr. 464).

On December 30, 2011, Mr. Cody again described D.D.G.'s overall functioning as stable and improving. (Tr. 459).  He explained that D.D.G. had "significantly improved his compliance in the home" and could continue to improve compliance with school rules. (*Id.*).

## IV.    SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant was born on April 7, 1996.  Therefore, he was a school-age child on October 14, 2009, the date the application was filed, and is currently an adolescent.

2.  The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3.  The claimant has the following severe impairments: attention deficit hyperactivity disorder, oppositional defiant disorder, and major depression disorder, single episode.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since October 14, 2009, the date the application was filed.

(Tr. 14-23) (internal citations omitted).

## V.      STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i).  Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled.  20 C.F.R. § 416.924.  First, the ALJ must determine whether the child claimant is working.  If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1.  An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).  Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria.  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings.  The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings.  These domains include:

(1) Acquiring and using information;
(2) Attending and completing tasks;

11

(3) Interacting and relating with others;
(4) Moving about and manipulating objects;
(5) Caring for yourself; and,
(6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains.  20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record.  20 C.F.R. § 416.927.  A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 416.927(c)(2).  When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions.  *Id.*  The ALJ must also account for the opinions

12

of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record. 20 C.F.R. § 416.927(e)(2)(i-ii). Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age. 20 C.F.R. § 416.926a(b)(3)(i-ii).

## VI.   STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 535 (6th Cir. 1981). Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion. The Commissioner's decision, if supported by substantial evidence, must stand. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the

Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VII.   ANALYSIS

Plaintiff raises two main allegations of error.  First, she maintains that the ALJ incorrectly concluded D.D.G. did not functionally equal a listed impairment.  According to Plaintiff, the ALJ's finding at this step of the evaluation is in error because the ALJ ignored evidence in the record from D.D.G.'s teachers.  Second, Plaintiff asserts that the ALJ improperly discredited testimony from herself and D.D.G.

### A. Functional equivalency & teacher reports

According to Plaintiff, the ALJ erred by finding that D.D.G. did not functionally equal a listing, because the evidence supports the opposite conclusion.  Plaintiff alleges that evidence in the record from two teacher reports establishes that D.D.G. had marked limitations in the domains of attending and completing tasks, and caring for yourself.  The ALJ found that D.D.G. had a marked impairment in the domain of interacting and relating to others, but found less than a marked impairment in the domains at issue here.

In February 2011, when D.D.G. was in the ninth grade, his English teacher, Mr. Lockmiller, and his math teacher, Ms. Adams, completed teacher questionnaires. (Tr. 441-48, 449-56).  Both teachers indicated that D.D.G. suffered from a range of problems in the domains of attending and completing tasks and caring for yourself. (*Id.*).

The regulations instruct the ALJ to consider information from the child claimant's teachers when assessing the severity of the child's impairments. 20 C.F.R. § 416.924a(a)(2)(iii). Social Security Ruling ("SSR") 06-03p explains how the Commissioner should address opinions from teachers, who are not "acceptable medical sources," but rather, are deemed "other sources."

SSR 06-3p, 2006 WL 2329939, at *1-2.  Information from other sources cannot establish the existence of a medically determinable impairment; however, the Commissioner should consider such information because it may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function. Id.; see Cruse v. Comm'r Soc. Sec., 502 F.3d 532 (6th Cir. 2007).

In regard to analyzing opinions from "other sources," SSR 06-3p explains that:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," *or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.*

2006 WL 2329939, at *6 (emphasis added).  The Ruling also sets out factors to be considered when evaluating opinion evidence from medical sources that are not acceptable medical sources. Id. at *4-5.  These factors include: how long the source has known the claimant, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, specialization, and how well the source explains the opinion. Id.

The text of the SSR 06-3p is merely advisory.  Indeed, "SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.' " Brewer v. Astrue, 2012 WL 262632, at *10 (N.D. Ohio Jan. 30, 2012).

In the present case, the ALJ's opinion does not reference Mr. Lockmiller and Ms. Adams's teacher questionnaires.  Nevertheless, the ALJ's opinion reflects that she sufficiently considered and addressed the evidence of record.  The ALJ examined, among other evidence, medical records, school records, and reports from stage agency psychologists.  A reading of the decision allows the Court to follow the ALJ's reasoning with regard to the teachers' opinions and

conduct a meaningful review such that remand on the basis of the ALJ's failure to expressly address these other sources is not warranted.

In support of her finding with regard to both of the domains at issue, the ALJ emphasized that over periods when D.D.G. took medication, D.D.G. functioned at an improved level. (Tr. 19, 22). Throughout the opinion the ALJ articulated a view of the evidence indicating that medication and treatment resulted in enhanced functioning, stabilizing D.D.G.'s mood and ability to focus at home and in school. (Tr. 16-17). The ALJ's discussion and analysis of the evidence demonstrates that reports completed by Mr. Lockmiller and Ms. Adams were undermined by evidence showing improvement with treatment, which called into question the severity of the problems the teachers identified on their questionnaires.

The ALJ's view of improved functioning with medication in regard to the two domains at issue is supported by the record. Within the domain analysis and earlier in her opinion, the ALJ refers to evidence showing that medication and treatment improved D.D.G.'s performance. For example, the ALJ cites medical records from Berea where D.D.G. resumed therapy after a lapse in treatment. (Tr. 17, 19). During the intake evaluation at Berea, Plaintiff specifically acknowledged D.D.G.'s behavior and mood had improved in the past when he was taking medication and receiving counseling, but worsened once such had ceased. (Tr. 525). At his first session with Berea, D.D.G. had problems with frequent feelings of anger and aggression. (Tr. 524). After D.D.G. reengaged in treatment and medication, there was notable improvement in D.D.G.'s mood and focus, with reports from Plaintiff that D.D.G. was less irritable and more calm overall. (Tr. 17, 484). Although the ALJ acknowledges that in November 2011 D.D.G. had an incident when he made cuts on his arm, hospital reports indicate that D.D.G. had not been compliant with taking medication that week. (Tr. 17, 22, 555). As the ALJ expressly recounted,

16

in December 2011 a therapist reported that D.D.G. was performing well in all of his classes. (Tr. 17, 459, 563).  The therapist characterized D.D.G.'s functioning as stable and improving, with D.D.G. performing well both academically and behaviorally at school. (*Id.*).

Furthermore, the ALJ discusses evidence before D.D.G.'s treatment at Berea that reflects improvement in D.D.G.'s behavior due to medication. (Tr. 16, 378).  These records from University Hospital also show problematic noncompliance with medication because Plaintiff failed to give it to the child.  For example, Plaintiff, D.D.G., and teachers reported improved academic performance on medication in January 2010. (Tr. 16, 378).  However, when Plaintiff stopped giving D.D.G. medication, she found that D.D.G.'s behavior worsened. (*Id.*).  Treatment notes from University Hospital through July 2010 continue to reflect inconsistency with D.D.G. taking medication, but also reports of positive effects of medication when administered. (Tr. 16, 356, 360-62, 419-20, 431).

Plaintiff argues that there was a period of at least three years when she did not have insurance and was unable to obtain treatment for D.D.G.  She maintains that during this time, D.D.G. could not handle frustration, be patient, use good judgment about safety and danger, or calm himself when agitated.  However, Plaintiff does not identify which years she was unable to obtain treatment due to lack of insurance, and moreover, she cites no evidence to support the assertion that she lacked access to medical care for three years.  During the hearing, Plaintiff made a vague reference to periods of being unable to obtain medicine for D.D.G. because she was uninsured, but she does not identify when these periods transpired. (Tr. 64).  The Commissioner points to one piece of evidence in which Plaintiff indicated the lapse in D.D.G.'s treatment prior to resuming treatment at Berea was due to a change in insurance. (Tr. 555).

17

Aside from this evidence, the Court is unaware of other support for Plaintiff being unable to afford treatment for the period during which she alleges D.D.G. was disabled.

Furthermore, the evidence before the Court more so supports the conclusion that noncompliance was often caused by Plaintiff's decision not to provide medication, rather than a barrier due to lack of insurance.  The ALJ made note of Plaintiff's failures to provide medication. (Tr. 16-17).  Additionally, the Sixth Circuit has recognized that disability will remain even when there is treatment that could cure it, but only when the claimant cannot afford the prescribed treatment or medicine, *and can find no way to afford it. McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990).  Here, Plaintiff has not shown that she had no other alternatives to afford or provide D.D.G. with medical care.

Along with the ALJ's observations of improvement with treatment, added support exists for the ALJ's domain analysis such that remand is not warranted.  For example, in the domain of attending and completing tasks, the ALJ noted that despite attention deficiencies, D.D.G. is able to play video games. (Tr. 19).  As to the domain of caring for yourself, the ALJ indicated that D.D.G. cares for his personal needs, rides his bike on his own to various locations, and had made efforts to regulate and manage his anger. (Tr. 22, 36, 52-54).  Although the ALJ recounted a November 2011 experience of suicidal ideation, treatment notes show that D.D.G. had skipped his medication for a week prior to the incident. (Tr. 22, 555).

Plaintiff also contends Dr. Koricke's finding that D.D.G. was markedly impaired in "personal and behavioral development" supports a finding of marked limitations in attending and completing tasks and caring for oneself.[1]  Plaintiff's arguments lack merit.  The ALJ noted in her

---

[1] Plaintiff also argues in the alternative that the ALJ should not have relied on Dr. Koricke's opinion at all because it was inconsistent with the record as a whole.  Given the inconsistency in Plaintiff's arguments, and a reading of the ALJ's opinion which indicates the ALJ provided little deference to Dr. Koricke's opinion, the undersigned finds that this argument fails.

opinion that at the time Dr. Koricke examined D.D.G., he was not receiving treatment for ADHD. (Tr. 16, 385). Dr. Koricke based her finding, in part, on the child's ADHD. (Tr. 386). Accordingly, Dr. Koricke's opinion was of lesser import as to D.D.G.'s ability to function and does not undermine the substantial support that exists for the ALJ's functional equivalency determination.

### B. The ALJ's Credibility Analysis

Plaintiff also asserts that the ALJ did not provide adequate grounds for discrediting testimony from D.D.G. and herself. It is the ALJ's responsibility to make decisions regarding the credibility of witnesses. "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Notwithstanding, the ALJ's credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the ALJ is "not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247.

This circuit follows a two-step process in the evaluation of a claimant's subjective complaints of disabling pain. 20 C.F.R. §§ 416.929(a), 404.1529(a); *Rogers*, 486 F.3d at 247; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853-54 (6th Cir. 1986); *Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994). First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. *Rogers*, 486 F.3d at 247. Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of

19

the symptoms on the claimant's ability to work. *Id*.  The ALJ should consider the following factors in evaluating the claimant's symptoms:  the claimant's daily activities; the location, duration, frequency and intensity of the claimant's symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve the pain; measures used by the claimant to relieve the symptoms; and statements from the claimant and the claimant's treating and examining physicians. *Id.*; *see Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186 (July 2, 1996).

In the present case, the ALJ found that statements from Plaintiff and D.D.G. concerning the intensity, persistence, and limiting effect of the child's symptoms were not fully credible. (Tr. 16).  To support the credibility determination, ALJ reasoned that the record showed D.D.G. was able to care for his personal needs, perform various household chores, do homework, ride his bike, play basketball, and hang out with friends. (Tr. 16, 207-215, 382-86, 34-62).  The ALJ also found that the severity of limitations that Plaintiff and D.D.G. described was not supported by objective medical evidence of record. (Tr. 16).

Plaintiff rightly asserts that some of the evidence the ALJ cited in support of the credibility finding is arguably taken out of context.  For example, evidence showed D.D.G. completed household chores, but Dr. Koricke's report stated that D.D.G. needed constant reminders to do so. (Tr. 214, 383).  While the ALJ found that D.D.G. was able to play basketball, D.D.G. testified that he was kicked out of basketball team tryouts because he did not listen to instructions and was not permitted to play on the team. (Tr. 58-60).

Nevertheless, overall the ALJ provided sufficient reasons in support of finding that Plaintiff and D.D.G. were not fully credible.  The ALJ highlighted evidence showing that

20

D.D.G.'s level of functioning did not support allegations regarding the extent of his limitations. The ALJ accurately observed that during the hearing, D.D.G. testified that he does his homework (Tr. 56), rides his bike to various locations (Tr. 51-52), plays video games (Tr. 48), and spends time with friends. (Tr. 51-52).  The record also indicates that D.D.G. was able to care for his personal needs, as noted by the ALJ. (Tr. 16, 213).

Additionally, the ALJ discussed medical and other evidence which reflects that D.D.G. improved with treatment and medication, contradicting Plaintiff and D.D.G.'s allegations of disabling symptoms. (Tr. 16-17).  For example, in December 2011, D.D.G.'s grades improved to "As" and "Bs." (Tr. 17, 466).  Around this time D.D.G.'s therapist described him as performing well academically and behaviorally. (Tr. 17, 464).  Accordingly, the ALJ's credibility determination is substantially supported and Plaintiff's allegation of error is not well-taken.

## VI. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court AFFIRMS the Commissioner's decision.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  January 8, 2015.

21